# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

PENNY ROXANNE POSTEL,

        Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,[1]
        Defendant.

No. 18-CV-2017-MAR

**ORDER**

---

    Plaintiff Penny Roxane Postel ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons the decision of the ALJ is **affirmed.**

## I.    BACKGROUND

    I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 19) and only summarize the pertinent facts here. Claimant was born on December 1, 1971 (AR[2] at 225.) Claimant is a high school graduate. (*Id.*) She allegedly became disabled due to PTSD, anxiety, and agoraphobia. (*Id.* at 263.) Claimant's alleged onset of disability

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

date was May 1, 2008 (*Id.* at 225.) Claimant filed applications for Social Security disability benefits and SSI on November 21, 2014. (*Id.* at 225-31.)[3] Claimant's claims were originally denied on February 27, 2015. (*Id.* at 131-40, 143-51.) Reconsideration was denied on May 14, 2015. (*Id.* at 154-71.) A video hearing was held on February 13, 2017 with Claimant, her then-attorney Cherie Pichone, and hearing reporter Anne Linden in Waterloo, Iowa and ALJ Janice Barnes-Williams and vocational expert ("VE") Amy Salva in Kansas City, Missouri.[4] (*Id.* at 37-67.) Claimant and the VE testified. (*Id.* at 38-66.)

Claimant filed post-hearing objections and rebuttal evidence on February 28, 2017. (*Id.* at 328-83.) The ALJ entered an unfavorable decision on March 23, 2017. (*Id.* at 13-29.) On May 15, 2017, Claimant filed a Request for the Appeals Council to review the ALJ's decision and filed a brief in support on May 22, 2017. (*Id.* at 223-24, 385-87.) On May 23, 2018, the Appeals Council found there was no basis to review the ALJ's decision. (*Id.* at 1-3.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On July 30, 2018, Claimant timely filed her complaint in this Court. (Doc. 4.) On June 8, 2018, the parties consented to have a magistrate judge conduct all proceedings in this case. (Doc. 15.) The case was originally assigned to then-Chief Magistrate Judge, the Honorable C.J. Williams and was reassigned to me on September 17, 2018. All briefs were filed by December 19, 2018.

---

[3] Claimant's application for SSI benefits does not appear to be in the record, although it is obvious she timely applied because the record contains denials of SSI benefits.

[4] Andrew S. Youngman was Claimant's main representative, but did not represent her at the hearing. (AR at 13.)

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v.*

*Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996)); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is

responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since May 1, 2008, the alleged onset date. (AR at 15.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: anxiety, panic disorder with agoraphobia, and post traumatic stress disorder ("PTSD"). (*Id.*) The ALJ also found that Claimant's asthma, hypertension, and obesity were nonsevere impairments. (*Id.* at 16.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.* at 17.) Specifically, the ALJ considered Claimant's mental impairments under 12.06 (anxiety

and obsessive compulsive disorders) and 12.15 (trauma- and stressor-related disorders).[5]
(*Id.* at 17.)

At step four, the ALJ found that Claimant had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> [Claimant] is limited to simple, routine and repetitive tasks, which may require detailed instructions but do not involve complex tasks. The work should be in an environment free of fast-paced production requirements and involve only simple, work-related decisions with few, if any, work place changes. There should be no interaction with the general public. She can work around co-workers, but with only occasional interaction with co-workers and supervisors.

(*Id.* at 19.) At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform, including order filler, meat skinner, and production helper. (*Id.* at 28-29.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.* at 29.)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). A court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*,

---

[5] The ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.06, 12.15, or any other listing." (AR at 17). No "other listing" is specified or discussed.

572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to properly evaluate the opinion evidence in the case and (B) relying on VE testimony to fulfill her step 5 burden without properly addressing her objections memorandum and rebuttal evidence related to the VE's testimony. (Doc. 22 at 3.)

*A.* ***The ALJ properly evaluated the opinion evidence in this case.***

Claimant argues that the ALJ did not properly weigh the opinion evidence in this case. Claimant takes issue with how the ALJ weighed the opinions of consultative examining psychologist Paul Conditt and Claimant's counselor, Angela Wilson. In addition, Claimant asserts that the ALJ did not properly weigh the opinions of state agency psychological consultants Russell Lark, Ph.D. and Jennifer Ryan, Ph.D.

"Where an ALJ does not rely on opinions from treating or examining sources, there must be some other medical evidence in the record for the ALJ's opinion to be supported by substantial medical evidence on the record." *Shuttleworth v. Berryhill*, No. 17-CV-34-LRR, 2017 WL 5483174, at *7 (N.D. Iowa Nov. 15, 2017) (quoting *Harvey*

*v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004)), *R. & R. adopted*, 2018 WL 1660084 (N.D. Iowa Apr. 5, 2018). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL 138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Meyers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)).

The following people provided opinions related to Claimant's mental impairments: examining psychologist, Paul Conditt, Psy.D.; Claimant's counselor, Angela Wilson; and state agency psychological consultants Russell Lark, Ph.D. and Jennifer Ryan, Ph.D.

### 1. Paul Conditt, Pys.D.

Dr. Conditt conducted an independent consultative examination of Claimant on February 20, 2015, and wrote his opinion on the same day. (AR at 514-16.) Dr. Conditt noted that Claimant was oriented in all spheres during her exam, her mood was "slightly depressed," and that her anxiety was "severe." (*Id.* at 515.) Claimant had her roommate accompany her to the examination because "she won't leave the house without having

someone with her." (*Id.*) Dr. Conditt stated that Claimant suffers from PTSD due to a history of abuse at the hands of her ex-husband, has flashbacks of being assaulted by her husband that are often triggered by yelling or loud noises, and "startles quite easily." (*Id.* at 514-15.)

Dr. Conditt noted that Claimant has started to feel depressed and overwhelmed and can only sleep for a couple of hours because of racing thoughts. (*Id.*) She also reported daily panic attacks that manifest in shortness of breath, a racing heart, her arms going numb, her "whole body tens[ing] up," and tunnel vision. (*Id.*) Claimant has daily crying spells and is "quite irritable." (*Id.*) Although Claimant is capable of cooking more complicated things, she only cooks microwave food and rarely does chores because "she can't be bothered." (*Id.*) Claimant is training a therapy dog, which she enjoys, but that only takes up part of her day. (*Id.*)

Dr. Conditt opined that although Claimant likely has average intelligence, her high anxiety impedes her intellectual functioning and causes difficulty with tasks involving concentration, memory, and had even simple arithmetic. (*Id.* at 515-16.) Dr. Conditt gave Claimant the following prognosis:

> Guarded. [Claimant] may improve with therapy, but at this point her ability to function outside of her home is extremely limited due to anxiety and hyper-vigilance.
>
> 1. As far as ability to understand instruction, procedures and locations, moderate impairment due to the effect that anxiety has on her cognitive functioning.
> 2. As far as ability to carry out instructions, maintain concentration and pace, severe impairment due to anxiety interfering with her ability to concentrate.
> 3. As far as ability to interact appropriately with supervisors, co-workers, and the public, severe impairment due to anxiety and being afraid that people are going to hurt her.

4. As far as ability to use good judgment and respond appropriately to changes in the work place, she would likely freeze or run away if something unexpected occurred.
5. As far as ability to handle funds, she is capable of managing her own finances.

(*Id.* at 516.)

The ALJ gave Dr. Conditt's opinion some weight because while the ALJ agreed that the medical evidence showed Claimant had "mental health symptoms," the ALJ also found that Claimant's condition "condition improved within 12 months of starting therapy in September of 2014." (*Id.* at 26.) The ALJ also stated that Claimant's own "admissions and the documentation of her capabilities, further suggest improved functional capacity." (*Id.*)

### a. *Legal Standard for Evaluating Dr. Conditt's Opinion*

Dr. Conditt is "an acceptable medical source" under Social Security regulations. 20 C.F.R. § 404.1502(a). Proper evaluation of a medical source's opinion requires consideration of the following factors: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[6] 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c). "[T]he regulations do not strictly require the ALJ to explicitly discuss each factor under 20 C.F.R. § 404.1527(c)." *Kuikka v. Berryhill*, No. 17-CV-374 (HB), 2018 WL 1342482, at *5 (D. Minn. Mar. 15, 2018) (quoting *Mapson v. Colvin*, No. 14–CV–1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015) (noting internal brackets omitted)). Claimant argues that the ALJ

---

[6] "Other factors" can include information claimants or others bring to the Social Security Administration's ("SSA") attention, or of which it is aware, which tend to support or contradict a medical opinion. "For example, the amount of understanding of [SSA] disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in [a claimant's] case record are relevant factors that [SSA] will consider in deciding the weight to give to a medical opinion." 20 C.F.R. § 404.1527(c)(6).

failed to provide good reasons for failing to give Dr. Conditt's opinion the "great weight" it is entitled to under the regulations. (Doc. 22 at 6.)

   b.   *Analysis*

      i.      *Examining Relationship*

"Generally, [ALJs] give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [a claimant]." 20 C.F.R. § 404.1527(c)(1). This is one of two factors that Claimant asserts the ALJ improperly evaluated when weighing Dr. Conditt's opinion. Claimant argues that SSA "regulations could not be clearer that a consultative examination opinion is generally entitled to great weight. Agency physicians are deemed under the regulations to have expertise in the evaluation of disability in general, and in particular with respect to Social Security programs. . . . Yet, the ALJ gave no deference to the special status that Dr. Conditt held with the Agency, nor did she credit that his examining relationship with Plaintiff generally entitled him to 'more weight' under the regulations." (Doc. 22 at 6-7.)

The Commissioner counters that "[t]o the extent plaintiff implies Dr. Conditt is a state agency medical consultant, the record does not support this implication. . . . [because] plaintiff was referred to Dr. Conditt by the state agency disability determination services." (Doc. 25 at 5 n.2 (citing AR at 514).) The Commissioner is correct. Dr. Conditt's opinion is written on letterhead from "Conditt Psychological Services" that has two providers listed on the letterhead: Paul M. Conditt, Pys.D. and Kristine M. Conditt, Pys.D. (AR at 514.) Dr. Conditt's opinion states that the source of referral for his evaluation of Claimant was Disability Determination Services. (*Id.*) Dr. Conditt is not an employee of the SSA and therefore holds no special status within the agency.

However, Dr. Conditt examined Claimant once in his role as an examining psychologist, which means he spent time with Claimant rather than just reading her

medical records. Thus, this factor weighs slightly in favor of giving Dr. Conditt's opinion increased weight.

### ii.        *Treatment Relationship*

"Generally, [ALJs] give more weight to the medical opinions from [a claimant's] treating sources. . . .  When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than . . . if it were from a nontreating source."  20 C.F.R. at § 404.1527(c)(2)(i).  In addition, "the more knowledge a treating source has about [a claimant's] impairment(s), the more weight the [ALJ] will give the source's opinion."  *Id.* at § 404.1527(c)(2)(ii).  As discussed, Dr. Conditt is not Claimant's treating psychologist.  He met with Claimant once to examine her, but not to treat her.  Therefore, this factor weighs against giving Dr. Conditt's opinion increased weight.

### iii.        *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion."  20 C.F.R. § 404.1527(c)(3).  Dr. Conditt stated that his opinion is based on "test results and other available information and it is based upon inferences, psychometric probabilities, and the typical limited time affordable to gather data and information."  (AR at 514.)  Dr. Conditt opined that Claimant was "oriented in all spheres, [h]er mood was slightly depressed, [and] her anxiety [was] severe."  (*Id.* at 515.)  Although the latest version of the *Diagnostic and Statistical Manual of Mental Disorders* (*DSM*) no longer uses GAF scores, Dr. Conditt assigned Claimant a GAF score of 53, which indicated that Claimant had "moderate difficulty in social occupational, or school functioning."  Am. Psych. Ass'n, *DSM-IV* at 32 (4th ed. 2005).  Because Dr. Conditt did not explain what tests he administered to

show how his opinion is supported, this factor does not weigh in favor of giving Dr. Conditt's opinion increased weight.

### iv. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ relied on evidence "as previously discussed in detail" to support her conclusion that Claimant's condition improved within twelve months of beginning therapy in September 2014.

Claimant testified at the hearing that she has daily panic attacks; agoraphobia that keeps her "'house ridden' the majority of the time"; an inability to go out alone; PTSD that is triggered by "noise, scents, body type, raised voices, and men who remind her of her ex-husband"; "chaos, fear, rage, paranoia, anxiety, [an] inability to focus or concentrate, and frustration, for which medications only help for an hour or two." (*Id.* at 20, 48-54.) Claimant also testified that "during a typical day she cries frequently and is paranoid." (*Id.* at 20, 47.) The ALJ concluded that while Claimant's impairments "could reasonably be expected to cause the alleged symptoms, . . . [Claimant's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 21.) The Court agrees.

Claimant asserts that a medical source's opinion need not be consistent with all the medical evidence in the record for the opinion to be entitled to substantial weight. (Doc. 22 at 9 (citing SSR 96-2p).) Claimant notes that Dr. Conditt's opinion is consistent with Ms. Wilson's opinion.[7] (*Id.* at 9.) This is true. However,

---

[7] Claimant actually made this argument in conjunction with Ms. Wilson's opinion. (Doc. 22 at 9-10.) However, because the argument compares Dr. Conditt's and Ms. Wilson's opinions, the Court has addressed it here, too.

Claimant cites no treatment notes or other parts of the record that support either Dr. Conditt's opinion or Ms. Wilson's opinion. Rather, Claimant argues only that "[t]he evidence demonstrates that [Claimant] has severe [PTSD] and anxiety stemming from domestic abuse" and that the ALJ ignored "the consistency between the examining opinions." (*Id.*) The Court will analyze each of these opinions separately to determine if the record as a whole supports them.

The ALJ agreed that Claimant's PTSD and anxiety are severe impairments (*Id.* at 15) and the Commissioner does not take issue with that conclusion. The ALJ did not agree, however, that Dr. Conditt's opinion was consistent with the medical evidence in the record. In her opinion, the ALJ cited "[r]ecent treatment notes that show improvement with therapy" to support her decision. (AR at 22-24.) After reviewing the record, the Court agrees with the ALJ that records show that Claimant's impairments improved after she entered therapy in September 2014. The record contains treatment notes from the Abbe Center for Community Health from September 25, 2014 through November 3, 2016. (*Id.* at 421-66, 529-60, 696-752.) For the most part, Claimant saw her counselor, Kimberly Ellingson, weekly. (*Id.*) Claimant first sought treatment for PTSD and anxiety shortly after she left her husband, who was both physically and emotionally abusive. (*Id.* at 424-25.) At her first session, Claimant presented in the following way:

> Alert and oriented to time, place, and person. Client made good eye contact throughout the session. Behavior throughout the session was cooperative and appropriate. Client presented casually dressed. Psychomotor activity appeared within normal range. Mood was dysphoric[8] and affect appeared

---

[8] Dysphoria is "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." *Stedman's Medical Dictionary* 599 (28th ed. 2006).

broad.[9]  Speech was of normal rate and rhythm.  Insight and judgment appeared to be fair.

(*Id.* at 426.)  The main focus of her treatment was to "decreas[e] trauma symptoms." (e.g. *id.* at 430.)  Claimant reported that her anxiety could be "excessive and sometimes can interfere in her life but not daily."  (*Id.* at 425.)  She reported "intense fear, helplessness, horror, intrusive recollections, avoiding talking about trauma, avoid going anywhere, diminished interest, sleeping problems, irritability."  (*Id.*)  Claimant was afraid to work because her husband used to threaten her dog if she worked and she was afraid he would come to her workplace and hurt her coworkers if she worked. (*Id.* at 424.)

By her next session, her mood had improved to "pleasant."  (*Id.* at 428.)  The rest of her mental status exam was again normal.  (*Id.*)  Claimant was still struggling with "leaving the house, fear of her ex."  (*Id.*)  Claimant's fear was impeding her job search because she was afraid her husband would hurt someone in her workplace.  (*Id.*) Claimant was referred for medication management.  (*Id.*)  Claimant continued to see Ms. Ellingson weekly and to work through her trauma.  She was an active participant in therapy throughout her treatment with Ms. Ellingson and her mental status exams revealed normal findings and usually "pleasant" or "dysphoric," sometimes "tearful," mood, unless Claimant was discussing a distressing topic. (E.g., *id.* at 430, 432, 437, 445, 449, 451, 453, 459, 463, 465, 542, 544, 548, 550, 552, 559, 703, 705, 711, 713, 715, 719, 721, 723, 725, 727, 729.)  If Claimant was discussing distressing topics such as the poor response she got from the police when calling for help when being abused, the abuse and neglect she suffered as a child, or the judge's decision to disallow her from

---

[9] Affect is "[t]he emotional feeling, tone, and mood attached to a thought, including its external manifestations."  *Id.* at 34.  A "broad" affect is normal.  U. Wash. Sch. of Med., Dept. of Psychiatry & Behavior Sci., https://depts.washington.edu/psyclerk/glossary.html.

reading her victim impact statement in court, her mood might be noted as "irritable," "angry," or something else, but was "congruent with session content." (E.g., *id.* at 439, 443, 463, 727, 729.) Claimant's behavior was always "cooperative and appropriate." (E.g., *id.* at 430, 432, 437, 445, 449, 451, 453, 459, 463, 465, 542, 544, 548, 550, 552, 554, 559, 703, 705, 711, 713, 715, 719, 721, 723, 725, 727, 729.) As early as October 10, 2014, Ms. Ellingson noted that Claimant had "good insight" and was "taking steps to empower herself." (*Id.* at 430.)

On October 27, 2014, Claimant presented to Nicolette Mabb, NP, for medication management. (*Id.* at 434-36.) Ms. Mabb diagnosed Claimant with PTSD, panic disorder with agoraphobia, rule out generalized anxiety and depressive disorder, physical abuse of an adult focus on victim. (*Id.* at 436.) Ms. Mabb's mental health status/risk factors assessment stated, in pertinent part, the following:

> She was appropriately dressed and groomed, clam and cooperative throughout the entire appointment. Speech was appropriate, rate, rhythm, volume and tone. Thought process goal oriented. Thought content not impaired by hallucinations or delusions. Affect was congruent with mood which was stated as "good." There was no evidence of responding to internal stimuli. Eye contact was good. Insight fair to good. Judgment fair to good. Anxiety not present. No psychomotor agitation or retardation. Focus and concentration appear on task. She was oriented to person, place, day and time. Memory and cognition not officially tested. She was able to answer my questions.

(*Id.* at 435.) Ms. Mabb noted that Claimant had thoughts of "rage" that were getting better the more she worked with Ms. Ellingson. (*Id.* at 434.) Ms. Mabb prescribed Fluoxetine 10 mg. daily, with the goal of weaning Claimant off Paxil once the Fluoxetine was "on board." (*Id.* at 436.) Claimant was already taking Alprazolam and Ms. Mabb did not change that prescription. (*Id.* at 434, 436.) On November 11, 2014, Claimant returned to Ms. Mabb and rated her mood as "1 out of 1 on a 10 point scale" because the judge in her ex-husband's abuse case refused to let her read her victim impact

statement in court. (*Id.* at 441.) Claimant's mental status examination was normal, with her "[a]ffect congruent with mood." (*Id.*) Ms. Mabb was concerned about Claimant's alcohol consumption and recommended that she no longer drink and that she attend substance abuse counseling. (*Id.* at 442.) She decreased Claimant's Paxil to 5 mg. a day. (*Id.*) Two weeks later, on December 1, 2014, Claimant reported that her mood was 6 out of 10, but that she as still "up and down" with her irritability, anger, appetite, and energy. (*Id.* at 447.) Her mental status examination was normal and she reported that discontinuing Paxil while being on Fluoxetine had been going "great." (*Id.* at 447-48.) Ms. Mabb discontinued Paxil. (*Id.* at 448.)

November and December 2014 were stressful times for Claimant as she dealt with roommate stress, family stress, the disappointment of not being able to deliver her victim impact statement, and the effects of getting off Paxil. (*Id.* at 443-55.) In spite of this, Claimant reported her mood as 6-7 out of 10 when she saw Ms. Mabb on December 18, 2014. (*Id.* at 457.) Claimant had been trying to get off Paxil, and reported that she usually could go about five days before the side effects were "almost too much to handle." (*Id.*) However, on that date, Claimant was on day five, and reported, "it's not too bad this time" and that she "does not feel moody or ultrasensitive." (*Id.*) Claimant reported that she had "cut way back" on her alcohol consumption. (*Id.* at 458.)

By January 1, 2015, Claimant was doing better and had modified the no-contact order with her husband so they could text about their divorce agreement. (*Id.* at 459.) She had been off Paxil for three weeks and was happy about that.[10] (*Id.*) She was experiencing some anxiety after talking to her husband because she did not trust his

---

[10] Ms. Ellingson's treatment note says Claimant has been "on" Paxil "for three weeks which she is very excited about." (AR at 459.) Given that Claimant told Ms. Mabb that she last took Paxil on December 13, 2014 (*Id.* at 457), "off" makes more sense. Moreover, in her January 5, 2015 treatment note, Ms. Mabb states that Claimant is completely off Paxil. (*Id.* at 461.) Therefore, the Court assumes "on" is merely a transcription or typographical error.

motives for "being nice." (*Id.*) Claimant saw Ms. Mabb on January 5, 2015, and reported that her mood was 7 out of 10, although some days were better than others and that anxiety and irritability were present in some form or another most days. (*Id.* at 461.) Claimant felt like her focus was off, but that therapy with Ms. Ellingson was going so well that she wanted to discontinue Fluoxetine. (*Id.*) Ms. Mabb prescribed a step-down program for Claimant to wean get off Fluoxetine. (*Id.* at 462.)

From late January through April 2015, Claimant dealt with many what she identified as "situational stressors" (*Id.* at 536) related to roommate issues and not feeling comfortable at home, family dynamics and issues related to newly-discovered childhood abuse and trauma, relationship issues, the death of her dog, stress about a cardiac procedure, and stress caused by her ex-husband. (*Id.* at 534-59; 697-703.) During this time, Claimant also tried different medications, including adding Fluoxetine and then increasing the dosage, trying Zoloft, and switching from Alprazolam (Xanax) to Clonazepam. (*Id.* at 540, 547, 558, 702.) By May 2015, Claimant was doing much better on Zoloft. (*Id.* at 709.) She had less anxiety, a better mood, and more energy. (*Id.*) She had switched herself back to Alprazolam because it worked better for her. (*Id.*) She was not scheduled for a follow-up appointment for three months. (*Id.* at 448.)

By May 2015, Claimant reported that her medications were helping, that she was doing better, and that she gave up drinking. (*Id.* at 709, 711.) In June 2015, Claimant's abusive ex-husband admitted that he poisoned one of Claimant's dogs and hinted that he might have poisoned her other dogs. (*Id.* at 717.) However, she and Ms. Ellingson worked through her anger about these revelations and to engage in healthy self-care. (*Id.* at 717, 719.) In July 2015, Claimant also used the skills Ms. Ellingson taught her to avoid going to the hospital when she experienced trauma after her fiancé's son pushed her. (*Id.* at 727.) In addition, Claimant's Grace C Mae Advocate Center July 22, 2015 intake form lists several interventions Claimant takes when she is anxious, including

walking her dogs, breathing exercises, listening to music, and calling her therapist. (*Id.* at 757.) Claimant also asked Ms. Ellingson for help with her airplane phobia. (*Id.* at 725, 727.) Although Claimant told Ms. Ellingson on July 15, 2015 that she was feeling "angry [and] hopeless" and had "conflicts in her relationship," by the next day, Dr. Hansen, who was now managing her medications, noted that "[o]verall [Claimant was] doing well." (*Id.* at 731, 733.) Claimant was happy with how her medications were working, was mowing lawns with her roommate for money, had four dogs that were a source of support for her, and had not been depressed or anxious. (*Id.* at 733.) Dr. Hansen continued Claimant on the same medications. (*Id.* at 734.)

On September 3, 2015, Claimant reported to Dr. Hansen that since he last saw her, "life's been pretty clam" and that she had gone to Las Vegas with her roommate. (*Id.* at 735.) Claimant had flown with no difficulties and had not taken any Xanax on the trip. (*Id.*) Claimant told Dr. Hansen that her medications were working. (*Id.*) Dr. Hansen continued Claimant on the same medications. Similarly, on November 5, 2015, Claimant reported to Dr. Hansen that "things continue[d] to go well for her." (*Id.* at 737.) Claimant was "in good spirits, . . . calm, . . . [and] feeling decent." (*Id.*) Dr. Hansen continued Claimant on her medications. (*Id.*)

On February 4, 2016, Dr. Hansen noted that Claimant was recently diagnosed at the Mayo with a conversion disorder secondary to anxiety and PTSD and that she is going through eye movement and desensitization reprocessing ("EMDR") therapy with her therapist. (*Id.* at 739.) Overall, Claimant felt like the EMDR was helping. (*Id.*) Claimant had just taken in another dog, was fixing up her house, and reported that "things [were] going well." (*Id.*)

On May 5, 2016, Claimant reported two recent stressful events to Dr. Hansen: the death of one of her dogs and her wife's recent diagnosis with a brain tumor. (*Id.* at 741.) Claimant was very worried, had been more tense and irritable than usual, and had a labile

mood.[11] (*Id.*) Claimant wondered if an increase in her Zoloft might help her. (*Id.*) Dr. Hansen described Claimant's mental status as "very appropriate. She was not crying, but she was sad. She was obviously missing her dog and worried about her partner. She's not suicidal. She's not homicidal. No delusions or hallucinations. Speech was normal Oriented x 3." (*Id.*) Dr. Hansen increased Claimant's Zoloft to 75 mg, but did not schedule her for a medication follow-up for two months. (*Id.*)

In July 2016, Claimant reported that EMDR was helpful and that the increased Zoloft has made her calmer without undesirable side effects. (*Id.* at 743.) Her wife continued to struggle, but they were inquiring about a second opinion. (*Id.*) Claimant's mood was "good" and her medications were continued. The last medical record is dated November 3, 2016. (*Id.* at 745.) Claimant reported that her ex-husband harassed and threatened her wife, her therapist, and her, and that the police do not respond to calls for help. (*Id.*) She also reported that it was hard for Claimant and her wife to get away from the ex-husband because their houses are very close to each other. (*Id.*) However, Claimant felt like her medications were working and did not want to change them. (*Id.*) Dr. Hansen noted that Claimant "was concerned about the activities of the ex[,] but she wasn't agitated. Her mood was decent. No suicidal ideas. No delusions or hallucinations. No homicidal ideas. Speech was normal. Oriented x 3." (*Id.*)

These treatment notes support the ALJ's decision. Although Claimant was undoubtably fragile when she began treatment in 2014, by November 2016, she was able to handle the life stressors that she was facing—the serious illness of her spouse and the continued threats of her ex-husband. Although the record does not contain any records of Claimant's sessions with the new therapist who took over her case after Ms. Ellingson left in July 2015, this therapist apparently instituted EMDR treatments, which proved

---

[11] Labile "denot[es] free and uncontrolled mood or behavioral expression of the emotions." *Stedman's*, *supra* n.8, at 1037.

helpful to Claimant. Moreover, the most recent mention of agoraphobia in a treatment note is from April 2015, ten months before the hearing in this matter. (*Id.* at 697.)

There is no mention in over two years of treatment notes of Claimant needing someone to accompany her to treatment or anywhere else.[12] Claimant took a dog to therapy-dog training, has gone to the police station—apparently alone—to report abuse, and has stated she would like to take a "self-care break" for a night alone in a motel, none of which support a finding of an inability to leave the house. (*Id.* at 697, 719.) In fact, Claimant walks her dogs as a way to cope with anxiety and stressors. (*Id.* at 757-58 (counselor note to "remind [Claimant] of coping skills," which included walking her dogs).) Claimant also navigated airports, airplanes, and other crowded places without the use of Xanax when she went to Las Vegas. These activities do not support a finding of fear that renders Claimant unable to leave the house alone (*Id.* at 51) or of being in the house crying and paranoid as she testified. (*Id.* at 47.) Moreover, although Claimant testified that her Alprazolam and Zoloft can make her "kind of out of it and tired" (*Id.* at 50), as discussed above, Claimant gets such good results from her medications without side effects that she has asked Dr. Hansen not to change her medications. Impairments that are managed with medication are not disabling. *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016); *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

Even when Claimant's treatment notes documented stress and Claimant was at her low points, it was when she was dealing with the stressful situations in her life such as family dynamics, past abuse, the illness and death of her dogs, anxiety over a cardiac

---

[12] Claimant's sister accompanied Claimant to one session with Ms. Ellingson. (AR at 550.) However, no mention was made that Claimant's sister was at the session because Claimant feared being alone. (*Id.* at 550-51.) Claimant and Ms. Ellingson discussed Claimant's sister's situation for part of this session. (*Id.* at 550.)

procedure, anxiety over her counselor leaving, roommate and romantic stress, and the stress of dealing with her abusive ex-husband—her self-titled "situational stressors." (E.g., *id.* at 439, 441, 443, 445, 449, 451, 453, 455, 536, 548, 559, 697, 699, 713, 715, 717, 719, 723, 727, 729, 731, 741, 745.) As discussed above, the most recent treatment notes in the record demonstrate that the combination of proper medications and newly-learned coping skills helps Claimant face these stressors while maintaining the overall ability to handle the rest of her life. For example, in November 2016, in spite of facing continued threats from her ex-husband and a seeming lack of action on behalf of law enforcement, Claimant was still proactive about getting relevant information about her wife's health and about advocating for her own medication regime—all without being "agitated." (*Id.* at 745.) Moreover situational stressors do not rise to the level of mental impairment. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039-40 (8th Cir. 2001).

Given the lack of evidence in the record of agoraphobia or disabling anxiety or PTSD since at least April 2015, this factor does not weigh in favor of giving Dr. Conditt's opinion increased weight.

### v.      *Specialization*

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Conditt has a doctorate in psychology and is a licensed psychologist who gave an opinion in his area of expertise about a patient under his care. (AR at 516.) Therefore, the ALJ was required to credit Dr. Conditt's opinion, if it was supported by the record. *See Brown v. Astrue*, 611 F.3d 941, 951, 954 (8th Cir. 2010) (affirming ALJ's decision to give greater weight to opinion of claimant's treating psychiatrist than to opinion of her family physician when claim was based on mental health issues). However, as discussed, Dr. Conditt's opinion

is not supported by the record. Moreover, all the opinions at issue in this case were provided by mental health professionals. Therefore, this factor is neutral.

### c. *Conclusion*

After a thorough review of the entire record, the Court finds that the ALJ's opinion regarding Dr. Conditt's opinion is supported by substantial evidence on the record as a whole and should not be disturbed. Accordingly, the ALJ's decision on this issue is affirmed.

### 2. *Angela Wilson, Claimant's Counselor*

Ms. Wilson is Claimant's counselor. The record does not contain any information related to Ms. Wilson's education or credentials. Claimant merely identifies her as a "counselor." (Doc. 22.) On December 20, 2016, Ms. Wilson completed a Mental Health Questionnaire that contained mostly check-box questions. (*Id.* at 673-75.) Ms. Wilson explained her check-box answers when the form provided space for her to do so. (*Id.* at 674-75.) Ms. Wilson did not state how long she has been Claimant's counselor, but explained that "per patient report," Claimant received her PTSD diagnosis from another therapist "prior to this writer" and that Claimant had been in therapy for two-and-one-half years at that point "to deal with symptoms." (*Id.* at 674.) Ms. Wilson agrees with the PTSD diagnosis because "in session/assessment there are marked incidents/symptoms of PTSD and anxiety." (*Id.* at 673-74.)

When asked to check off the "signs and symptoms associated with [Claimant's PTSD diagnosis]," Ms. Wilson checked the following: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change; sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; paranoid thinking; hyperactivity; pressure of speech; easy distractibility; involvement in activities that have a high probability of painful consequences which are not recognized; generalized persistent anxiety; motor tension; apprehensive expectation;

and vigilance and scanning. (*Id.* at 673.) Ms. Wilson also checked off the following "other symptoms": poor memory; personality change; emotional lability; paranoia or inappropriate suspiciousness; hostility or irritability; pathological dependence or passivity; somatization unexplained by organic disturbance; time or place distortion; social withdrawal or isolation; blunt, flat, or inappropriate affect; illogical thinking or loosening of associations. (*Id.* at 674.)

Ms. Wilson opined that Claimant had a "persistent irrational fear of . . . big crowds [and] people in close proximity of a space." (*Id.*) She also opined that Claimant's recurrent obsession or compulsion for checking doors and windows to make sure they are closed or locked and Claimant's recurrent and intrusive recollections of traumatic experiences are sources of marked distress for Claimant. (*Id.*) Ms. Wilson stated that "crowds, certain people, certain things, or T.V." could cause "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week." (*Id.*)

Ms. Wilson further opined that Claimant's PTSD and anxiety caused marked restrictions in Claimant's activities of daily living; social functioning; and concentration, persistence or pace. (*Id.* at 675.) She also opined that Claimant's PTSD and anxiety caused moderate "episodes of deterioration or decompensation in work or work-like settings which caus[ed Claimant] to withdraw from that situation or to experience exacerbation of signs or symptoms." (*Id.*) "Marked impairment" was defined as "[a]n impairment which seriously affects [the] ability to function independently, appropriately and effectively." (*Id.*) "Moderate impairment" was defined as "[a]n impairment which affects but does not preclude [the] ability to function." (*Id.*)

Ms. Wilson stated that Claimant's impairments caused Claimant to experience "shortness of breath, panic attacks, bad headaches, difficulty swallowing, limbs go numb, [and] freeze at times." (*Id.*) She opined that Claimant would miss more than four days

of work a month. (*Id.*) Ms. Wilson did not attach any medical records to her opinion or cite any medical records in her opinion. The record contains none of Ms. Wilson's treatment notes.

The ALJ considered how Ms. Wilson's opinion "show[s] the severity of the claimant's impairments and how they affect her ability to work." (*Id.* at 25.) The ALJ gave Ms. Wilson's opinion little weight because she found it "extreme in light of the actual findings documented in the record, seemingly based on the claimant's self-reporting and generally not consistent with the record as a whole or well supported by the objective evidence of record." (*Id.*) The ALJ noted that while Claimant often reported "anxiety, panic attacks, PTSD symptoms, shortness of breath, chest pains, depression and crying spells" to her healthcare providers, "numerous mental status examinations . . . yielded grossly normal results." (*Id.* (citing the record).) The ALJ also noted that Ms. Wilson's opinion is "quite conclusory" and provides "no specific and substantiated explanation of the evidence relied on in formation." (*Id.*)

### a.    *Legal Standard*

Because the Court does not know Ms. Wilson's level of education or certification, under SSA regulations, she is either a "medical source[] who [is] not [an] 'acceptable medical source[]' or a 'non-medical source.'" SSR 06-03p, 2006 WL 2329939, at *2. This distinction makes no practical difference because the analysis of her opinion is the same regardless of her classification. Medical sources who are not acceptable medical sources are considered "other sources" *Id.*[13]

Although the five factors enumerated in 20 C.F.R. 404.1527(d) and 416.927(d) apply exclusively to the evaluation of medical opinions from "acceptable medical

---

[13] The ALJ stated that Ms. Wilson is a licensed social work and cited page 673 of the record for support. (AR at 25.) The Court finds no information on page 673 or anywhere else in the record that indicates Ms. Wilson is a licensed social worker.

sources," the same factors *can* be applied to opinions of "other sources." *Id*. at *4 (emphasis added). These factors include the following:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

*Id*. at ** 4-5. Furthermore, "In determining what weight to give 'other medical [source] evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Peterson v. Colvin*, No. C14-4110-LTS, 2016 WL 1611480, at *6 (N.D. Iowa Apr. 21, 2016) (quoting *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)).

> An ALJ is required to consider other sources, but may discount these sources if such evidence is inconsistent with the evidence in the record. *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 886-87 (8th Cir. 2006); *Raney*, 396 F.3d at 1010). The ALJ is required to explain the "weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p.

*Id.*; *see also Gulick v. Colvin*, No. C13-4038-MWB, 2014 WL 197727, at *11 (N.D. Iowa Jan. 17, 2014), *R. & R. adopted*, 2014 WL 941730 (N.D. Iowa Mar. 11, 2014) (quoting SSR 06-3p). Therefore, the Court must determine if the opinion is consistent with other evidence in the record and whether the ALJ's decision allows the Court to follow her reasoning.

### b.    Analysis

The Court finds that the ALJ's opinion allows the Court to follow her reasoning. As discussed above, Ms. Wilson's opinion is consistent with Dr. Corbitt's opinion, which means it is not consistent with the medical evidence in the record as a whole.   Most importantly, Ms. Wilson's opinion is inconsistent with the treatment notes of Claimant's long-time treating counselor Ms. Ellingson and the treatment notes of Claimant's medication managers at the Abbe Center, all of which showed marked improvement in Claimant's symptoms over time with medication and use the coping techniques she learned from Ms. Ellingson.   More importantly, Ms. Ellingson's treatment notes and the medication manager's treatment notes are the only relevant treatment notes in the record. Claimant does not direct the Court to any support other than Dr. Conditt's previously-discredited opinion.   Although Ms. Wilson states that Claimant exhibits PTSD and anxiety in her sessions with Ms. Wilson, without having any treatment notes to evaluate, that assertion is unsupported.  *See* SSR 06-03p, 2006 WL 2329939, at **4-5 ("The degree to which the source presents relevant evidence to support the opinion" may be considered when weighing other source opinions.)

In addition, although Ms. Wilson "fills in the blanks" where provided, she does not elucidate her opinion by doing so.   Ms. Wilson merely explains that she took over Claimant's case from another provider and that Claimant exhibits signs of marked anxiety and PTSD in sessions.  (AR at 674.)  As discussed above, without supporting treatment notes or support in the record as a whole, this statement does not provide a reason to disturb the ALJ's decision.  Likewise, Ms. Wilson's recitation of Claimant's description of her panic attacks and other physical manifestations of her mental impairments (*Id.* at 675) is unsupported by treatment notes. Importantly, because many of these physical manifestations are the same as those Claimant recited to Ms. Ellingson and Ms. Mabb when she first began treatment in 2014 (*Id.* at 425, 434) it is impossible to tell if Ms.

Wilson is listing historical symptoms or symptoms Claimant was then-currently reporting to her, even though she was not reporting them to Dr. Hansen at the same time. The same can be said of Ms. Wilson's statements that Claimant has a persistent irrational fears of crowds, people, and recurrent severe panic attacks triggered by "crowds, certain people, certain things on T.V." (*Id.* at 674.) As discussed in the Court's analysis of Dr. Conditt's opinion, Claimant was able to navigate crowds when she flew and all recent treatment notes indicate that Claimant's use of medication and coping techniques limits her panic attacks because they are not mentioned in recent treatment notes.

As to Ms. Wilson's opinion that Claimant has an obsession with checking and locking doors and windows (*Id.*), the only mention of this behavior is in Ms. Ellingson's first treatment note, dated September 9, 2014. (*Id.* at 425.) It was never mentioned again. Even at that time, Claimant said the obsession was already better than it had been because she was no longer living alone. (*Id.*) Ms. Mabb noted nothing about this behavior during her first appointment with Claimant and Claimant screened negative for OCD at that appointment. (*Id.* at 434.) Thus, there is medical evidence in the record that contradicts this part of Ms. Wilson's opinion.

The Court finds that the same is true for Ms. Wilson's conclusions that Claimant has 25 of the 36 symptoms listed on the checklists on the opinion form. While the evidence supports a finding that Claimant has had some of these symptoms in the past, the most recent records do not support these findings. In Claimant's last three treatment notes in the record from May, July, and November 2016, her mental status was described as "appropriate," "good," and "concerned . . . but [not] agitated." (AR at 741, 743, 745.) This, is spite of facing the death of one of her dogs, her wife's brain tumor diagnosis and declining health, and renewed harassment from her ex-husband during this time. (*Id.*) These treatment notes are nearly contemporaneous with Ms. Wilson's December 2016 opinion. Claimant had the burden to prove her disability and did not

provide any of Ms. Wilson's treatment notes to support the opinion. *See Moore*, 572 F.3d at 523. Thus, Ms. Wilson's opinion consists mostly of checklists, cites no medical evidence, and gives no explanation for its conclusions. "'The checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (addressing a physician's opinion) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996)).

Accordingly, as discussed above, the Court agrees with the ALJ that Claimant's mental status examinations were mostly normal, that Ms. Wilson did not support her opinion with her own treatment notes or citations to other treatment notes, and that Ms. Wilson's opinion is not supported by the record as a whole. (AR at 25.) Although Ms. Wilson's opinion is consistent with Claimant's hearing testimony and Dr. Conditt's opinion, the record as a whole does not support the extreme limitations Claimant apparently reported to both Ms. Wilson and Dr. Conditt. Ms. Wilson's opinion, in particular, is undermined by contemporaneous treatment notes from Dr. Hansen documenting Claimant's good mental health in spite of life challenges. (*Id.* at 741-46.) Therefore, the ALJ's decision on this issue is affirmed.

### 3. State Agency Psychological Consultant Opinions

#### a. State Agency Psychological Consultant Russell Lark, Ph.D.

On February 27, 2015, Russell Lark, Ph.D., reviewed the record for the state agency and opined, in pertinent part, that Claimant had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (*Id.* at 71-72.) Dr. Lark also opined that that Claimant had no repeated episodes of decompensation of extended duration. (*Id.* at 72.) Finally, Dr. Lark stated that Claimant's attention, concentration, and pace are adequate for tasks not requiring sustained attention; Claimant is able to

complete at least simple, repetitive tasks on a sustained basis; and that Claimant will likely work better in a low-stress situation with low/change and limited interactions with others. (*Id.* at 75-76; 88.)

The ALJ gave this opinion significant weight because, as a state agency psychological consultant, Dr. Lark is "well versed in the Social Security Act and regulations and because Dr. Lark's opinion was consistent with medical evidence in the record as a whole. (*Id.* at 24.) The ALJ found that Dr. Lark's opinion was consistent with objective evidence showing that Claimant's symptoms improved after she started therapy "as evidenced by numerous normal mental status examinations with normal psychological and neurological findings." (*Id.*)

### b. State Agency Psychological Consultant Jennifer Ryan, Ph.D.

On May 12, 2015, Dr. Ryan reviewed the record on reconsideration of Claimant's initial denial of benefits. (*Id.* at 104, 120.) Dr. Ryan divided her opinion into two relevant sections. The first one covered the period March 1, 2013 to May 12, 2015. In that opinion, Dr. Ryan opined that medical evidence in the record indicated "a worsening of the claimant's anxiety starting 9/25/14, largely related to separation and divorce from the claimant's abusive husband." (*Id.* at 104, 120.) Dr. Ryan opined that Claimant had moderate restrictions on her activities of daily living; marked difficulties in social functioning; marked difficulties in maintaining concentration, persistence, and pace; and that Claimant had no repeated episodes of decompensations of extended duration. (*Id.* at 98-99.) Dr. Ryan noted that the record is "insufficient from 3/1/13 to 9/24/14." (*Id.*) She further opined that records indicated that Claimant's symptoms "have been severe since 9/25/14." (*Id.*)

Dr. Ryan then noted that Claimant's anxiety, specifically as it relates to leaving the house, has been improving with on-going therapy. (*Id.*) Dr. Ryan concluded that

"[b]ased on documented functioning prior to 3/1/13[14] and noted improvement in the Claimant's anxiety with ongoing therapy, the preponderance of the evidence contained in the file supports the assertion that the claimant's condition will continue to improve such that she will be capable of [substantial gainful activity] employment as outlined [in the mental RFC assessment] by 9/25/15. (*Id.*)

In her mental RFC assessment covering the period "12 months After Onset: 09/25/2015," Dr. Ryan further opined that Claimant's abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; respond appropriately to changes in the work setting; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited. (*Id.* at 100-02; 116-18)

The ALJ gave partial weight to this opinion. (*Id.* at 24.) Specifically, she gave little weight to Dr. Ryan's finding of marked limitations for the period from March 1, 2013 to May 12, 2015 because "the record is totally void of any supporting mental health treatment during that period." (*Id.*) The ALJ gave substantial weight to Dr. Ryan's findings of moderate limitations in all areas of mental functioning as of September 25, 2015 because this finding was consistent with the overall record and well supported by objective evidence, including "numerous mental status examinations with normal psychological and neurological findings during the relevant period." (*Id.* at 24-25.)

---

[14] It appears that Dr. Ryan reviewed Claimant's record in conjunction with a previous application for benefits for the period from December 5, 2011 to February 28, 2013. (AR at 97-100, 113-16.)

### c.     *Analysis*

Claimant argues that the ALJ improperly weighed the state agency consultant opinions because "the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and individual become weaker." (Doc. 22 at 10.)   Claimant does not state what test the ALJ failed to apply to these opinions.

Claimant also takes issue with how the ALJ weighed Dr. Lark's and Dr. Ryan's opinions because "in choosing between the non-examining opinions, the ALJ assigned the most weight to the consultant who reviewed *the least evidence*," which demonstrates that the ALJ relied on a lay interpretation of the record.  (*Id.*)

It appears that only two relevant records were added to the administrative record between the time Dr. Lark wrote his opinion and when Dr. Ryan wrote her opinion: updated records from the Abbe Center and Claimant's updated Function Report-Adult. (*Id.* at 110.)

The ALJ assigned little weight to Dr. Ryan's opinion that Claimant had marked limitations for the period from March 1, 2013 to May 12, 2015 because the record was "void" of mental health treatment that supported that conclusion.  (*Id.* at 24.)  It is easy to  affirm the ALJ's decision for the time period prior to September 25, 2014 when Claimant began treatment with Ms. Ellingson at the Abbe Center.  Except for cursory "normal" notations in the psychological triage category of treatment notes focusing on other health problems, there are no treatment notes in the record prior to that date documenting mental health care.  Then, as discussed above, in spite of Claimant's anxiety early in her treatment with Ms. Ellingson, Claimant's mental status examinations were generally normal; she was an active participant in treatment; and even when she was angry or upset, her mood was congruent with the situation.  *See* discussion of mental status examinations, *supra*, Part III.A.1.b.iv.  Discussing anxiety and difficult situations

is not the same as being medically incapacitated by those situations. Claimant rightly sought help for her impairments and, of course, treatment included discussion of her then-current life situations. However, treatment also included evaluation by her health-care professionals who assigned generally normal results to Claimant's mental status exams and never suggested in-patient treatment or other more serious measures.

The ALJ's decision for the period after May 12, 2015 is also supported by substantial evidence in the record as a whole. As acknowledged by Dr. Ryan and discussed above, the treatment notes in the record document Claimant's increasingly stable mental health. Even when Claimant was faced with multiple stressors at one time— the death of her dog, her wife's serious illness, and her ex-husband's increasing harassment—she was able to maintain her perspective and balance with the help of medication and coping skills. (*Id.* at 745.)

Thus, the Court finds that the ALJ did not impermissibly choose between the consulting psychologist's opinions and rely on a lay interpretation of the record. Rather, the ALJ properly fulfilled her duty to weigh the evidence before her. *See Keehn v. Halter*, No. C00-3064-MWB, 2002 WL 31039628, at *24 (N.D. Iowa Mar. 23, 2002) ("The ALJ may 'weigh evidence and make judgments as to what evidence is most persuasive.'") (quoting *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985)).

Moreover, the Court finds Claimant's argument that the ALJ gave more weight to the opinion of a consultant who weighed fewer documents than another consultant who weighed more documents without merit for two reasons: (1) the record as a whole does not support a finding of marked limitations and (2) Dr. Ryan bifurcated her opinion.

As discussed throughout this order, the record as a whole does not support a finding of marked limitations in Claimant's functioning. Thus, whether one consulting physician reviewed fewer or more documents than another consulting physician would not have changed the ALJ's decision or the Court's decision on this issue. Treatment

notes in the record simply do not support more limitations than the ALJ assigned. Throughout her briefs, Claimant makes much of Ms. Wilson's opinion, calling Ms. Wilson Claimant's "treating counselor" and noting that Ms. Wilson's opinion is consistent with the impairments and limitations Claimant reported to Dr. Conditt. This may be true. However, Claimant's allegations of severe impairments are not supported by her counselor's and medication managers' treatment notes, the only mental health medical evidence in the record. As noted above, in spite of the challenges Claimant was facing in her life, Ms. Ellingson's mental health assessments of Claimant were generally normal. Therefore, this argument is without merit.[15]

That Dr. Ryan bifurcated her opinion is important because Claimant focuses on the ALJ's assignment of partial weight to Dr. Ryan's opinion when the ALJ more accurately assigned two different weights to the opinion. Claimant seems to ignore that the ALJ actually assigned significant weight to the part of Dr. Ryan's opinion addressing the time period after May 12, 2015, which means that the ALJ assigned significant weight

---

[15] Claimant, relying on *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d. 1194 (9th Cir. 2008), argues:
> that Counselor Wilson relied on Plaintiff's subjective complaints cannot seriously be said to weigh against the veracity or accuracy of her opinion, since the patient's description of her impairments is *always* taken into account in treatment, particularly with respect to mental health. To the extent that the ALJ is *implying* (without actually saying so) that she relied in some *improper way* on Plaintiff's description of her impairments, there is no basis for this in the record.

(Doc. 22 at 8.) Claimant's case can be distinguished from *Ryan*. The *Ryan* court held that an ALJ erred by deciding that a consulting psychiatrist had relied upon the claimant's subjective complaints more than his own clinical observations when the ALJ concluded that the psychiatrist's opinion was inconsistent with the treatment notes of the claimant's treating physician. 528 F.3d at 1195, 1200. In this case, however, Ms. Ryan's opinion *was* inconsistent with the treatment notes of Claimant's long-time treating counselor and her medication providers. Moreover, while the ALJ did note that Ms. Wilson's opinion seemed to be based on Claimant's subjective complaints, she also found that Ms. Wilson's opinion was not supported by the objective medical evidence and that the cursory check-box format of Ms. Wilson's opinion was conclusory and provided no explanations "of the evidence relied on in the formation" of her opinions. (AR at 25.)

to the opinion of a consulting psychiatrist who reviewed the additional documents that Dr. Lark did not review.

Finally, Claimant argues that "if the ALJ wanted to consider denying this claim, . . . [the ALJ] could have sent the entire record to a medical expert for review and to testify at a hearing; sent the updated file back to the Agency's non-examining consultants for review of the entire file; arranged for a new consultative examination, or . . . re-contacted Dr. Conditt and/or Counselor Wilson with questions or for clarification." (Doc. 22 at 12.) An ALJ is not required to re-contact medical sources or order consultative evaluations unless the available evidence does not provide an adequate basis for deciding the claim on its merits. *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004). Moreover, "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently . . . unreliable. This is especially true when the ALJ is able to determine from the record whether the applicant is disabled." *Hacker*, 459 F.3d at 938 (holding that there is no need to recontact a treating physician where the ALJ can determine from the record whether the applicant is disabled) (citing *Sultan*, 368 F.3d at 863). As discussed above, both the ALJ and the Court found Dr. Conditt's and Ms. Wilson's opinions "unreliable" insofar as they are not supported by substantial evidence in the record as a whole. "The ALJ did not recontact the psychologists or order new consultative evaluations because they were not necessary." *Gentry v. Berryhill*, 4:18CV3044, 2018 WL 6045257, at *6 (D. Neb. Nov. 19, 2018). In addition, as discussed above, if Claimant was dissatisfied with Ms. Wilson's opinion or with the support she provided for that opinion, it was Claimant's burden build the strongest record she could prior to her administrative hearing. *See Moore*, 572 F.3d at 523 (Claimant has the burden to prove her disability). The Court finds that the ALJ's decision on this issue is supported by substantial evidence in the record as a whole and is affirmed.

### 4.    Conclusion

Based on the above discussion, the Court affirms the weights the ALJ assigned to the medical opinions in the record.

**B.    The ALJ properly relied on VE testimony to fulfill her step 5 burden and properly addressed Claimant's objections memorandum and rebuttal evidence related to the VE's testimony.**

At the hearing, the ALJ posited one hypothetical to VE Amy Salva. (AR at 57.) In relevant part, the hypothetical assumed a person with no exertional limitations who was limited to "performing simple, routine, repetitive tasks. . . . [with] no public interaction. . . [T]he individual [could] work around coworkers throughout the day, but with only occasional interaction." (*Id*.)  The VE provided the ALJ with three jobs at the medium, unskilled level, SVP level 2 that this person could perform: order filler, meat skinner, and production helper.  (*Id*. at 58.)   The VE provided the number of jobs available nationally for each of these positions and the *DOT*[16] code of each of the positions.  (*Id*.)

Claimant's attorney did not posit different hypotheticals to the VE, choosing instead to ask the VE if a person being "off task greater than 20 percent of the time" and missing more than three days of work per month would affect a person's ability to maintain full-time work.  (*Id*. at 58-59.)  Claimant's attorney also asked the VE if the person could do the jobs listed by the VE if the person had "environmental limitations" such as not being around "dust and fumes, heavy chemical smells, stuff like that."  (*Id*. at 59.)  The VE testified that the person could still perform all the jobs she mentioned. (*Id*.)

---

[16] *DOT* is the acronym for the *Dictionary of Occupational Titles* (4th ed. rev'd. 1991), a publication of the U.S. Department of Labor.

Claimant's attorney asked the VE the sources of her job numbers. The VE testified that the sources of her job numbers were the Kansas Business Directory, Missouri Business Directory, U.S. Publishing, U.S. Department of Labor, and SkillTRAN. (*Id.* at 62.) The VE testified that her testimony was consistent with the *DOT* and its companion publication. (*Id.* at 65-66.) She further testified that her testimony regarding working with the public, coworkers, being off task, and being absent from work was based on her experience as a vocational counselor. (*Id.* at 66.)

Claimant filed a post-hearing memorandum containing numerous objections to the VE's testimony. (*Id.* at 328-84.) Claimant now argues that the ALJ failed to address the majority of her post-hearing objections in her decision and remand is necessary to address those issues. Specifically, Claimant seeks remand for "further development of vocational evidence" that she plans to obtain by questioning the VE. Given the nature of Claimant's post-hearing objections, this questioning would presumably be about the VE's methodology for deciding what jobs were appropriate for someone with Claimant's RFC and why the VE relies on certain sources for job numbers. (Doc. 22 at 23; Doc. 26 at 4.)

### 1. Claimant's Objections to the VE's Testimony, Proffered Rebuttal Evidence, and Current Arguments

The Court finds the recent opinion in *Patterson v. Saul* instructive regarding the issues raised in Claimant's brief. No. 3:18-0641, 2019 WL 4237854 (M.D. Tenn. Aug. 2, 2019), *R. & R. adopted*, 2019 WL 4237855 (M.D. Tenn. Aug. 23, 2019). *Patterson* notes that the claimant's counsel had tried to undermine the credibility of VEs in several jurisdictions around the country after administrative hearings by raising the same issues he now raises in the case at bar. *Id.* at *5 (citing cases from several jurisdictions).[17] As

---

[17] Claimant's pro hac vice counsel also represented the claimant in *Patterson*.

in *Patterson*, Claimant's hearing representative was from Citizens Disability, LLC and filed a pre-hearing memorandum that included a request that the ALJ delay her decision for thirty days following the hearing to allow Claimant time to file her post-hearing brief and address VE testimony due to the "density of the *Dictionary of Occupational Titles* (*DOT*) and the fact that [Claimant's counsel] was not privy to the specific jobs that the VE would identify in response to the ALJ's hypotheticals." *Patterson*, 2019 WL 4237854 at *4; (AR at 326).

The record does not state whether the 30-day delay was granted. Claimant's counsel filed a post-hearing objections memorandum and accompanying exhibits 15 days after the hearing. (AR at 328-84.) The post-hearing objections fell into five categories: (1) the VE was unqualified to give opinions as to the number of jobs available in the economy, (2) the VE's testimony regarding job availability was "unfounded, unsupported, unreliable, and conjured from whole cloth;" (3) the jobs offered by the VE in response to the hypothetical were inappropriate because the positions require more than occasional or superficial interaction with coworkers or supervisors; (4) the jobs offered by the VE are no longer performed at the unskilled level; and (5) the skinner job offered by the VE would occasionally involve "other environmental conditions" and is thus an inappropriate job for Claimant. (*Id.* at 328-35.)

Currently before the Court is Claimant's argument that the ALJ addressed only one of Claimant's post-hearing objections in her decision. Claimant acknowledges that the ALJ addressed "the methodology for determining job numbers" in her decision, but states that the ALJ "failed to mention" Claimant's other objections or evidence. (Doc. 22 at 21.) In spite of her acknowledgement, Claimant does not seem to concede any issues raised in her post-hearing brief. *Patterson* succinctly outlined the strategy Claimant's counsel uses in this case.

Counsel for [Claimant] appears to regularly employ [these] assertion[s] of error in cases that span several districts, with varying degrees of success. As in the instant case, counsel's post-hearing brief will frequently characterize the VE's statements during the administrative hearing as "surprise testimony" that claimant's representative was not permitted to meaningfully subject to cross-examination. *See, e.g.*, *Jeffries v. Berryhill*, No. 1:18-cv-51, 2019 WL 1005501, at *5 (M.D.N.C. Mar. 1, 2019), *R. & R. adopted*, 2019 WL 2468241 (M.D.N.C. Mar. 29, 2019); *Revere v. Berryhill*, No. 3:17-cv-774 (DJN), 2019 WL 99303, at *5 (E.D. Va. Jan. 3, 2019); *Gaylord v. Berryhill*, No. 17-cv-3196, 2018 WL 8188568, at *13 (C.D. Ill. Nov. 5, 2018), *R. & R. adopted*, 2019 WL 1330892 (C.D. Ill. Mar. 25, 2019); *Green v. Berryhill*, No. CA 17-0218-MU, 2018 WL 1278433, at *4 (S.D. Ala. Mar. 12, 2018). After identifying alleged inconsistencies in the VE testimony and objecting to the methodology used by the VE to determine which jobs the claimant can perform, the post-hearing brief will . . . [often] demand that the ALJ conduct a "supplemental hearing" to address these issues. *See, e.g.*, *Slone v. Berryhill*, No. 1:17-cv-00452-SLC, 2018 WL 5729591, at *6 (N.D. Ind. Nov. 1, 2018); *Reep v. Berryhill*, No. 3:17-cv-571-MOC, 2018,WL 3747285, at *3 (W.D.N.C. Aug. 7, 2018); *Offield v. Colvin*, No. 14-1060-cv-W-REL-SSA, 2016 WL 223716, at *15 (W.D. Mo. Jan. 19, 2016). If the ALJ's opinion fails to explicitly address the objections in the post-hearing brief, counsel will, like the brief in the current case, allege the existence of due process violations, *See, e.g.*, *Pickett v. Berryhill*, No. 5:17-cv-01413-LSC, 2019 WL 968901, at *7 (N.D. Ala. Feb. 28, 2019); *Gentry v. Berryhill*, No. 4:18-cv-3044, 2018 WL 6045257, at *9 (D. Neb. Nov. 19, 2018); *Thompson v. Berryhill*, No. 2:16-cv-1182 BCW, 2018 WL 1568760, at *2 (D. Utah Mar. 29, 2018), and accuse the ALJ of violating HALLEX. *See, e.g.*, *Rockholt v. Berryhill*, No. CIV-17-578-G, 2018 WL 4462231, at *7-8 (W.D. Okla. Sept. 18, 2018); *Donald H. v. Berryhill*, No. 6:17-cv-1358-JR, 2018 WL 3727897, at *2 (D. Or. Aug. 6, 2018); *Cortez v. Berryhill*, No. CV 4:17-1493, 2018 WL 4103622, at *2 (S.D. Tex. July 23, 2018), *R. & R. adopted*, 2018 WL 3863484 (S.D. Tex. Aug. 13, 2018).

2019 WL 4237854, at *5. This approach "has found success in some courts." *Id*. at *6

(citing *Westmoreland v. Berryhill*, No. 3:17-cv-00096, 2018 WL 1522118, at *4 (S.D.

Ohio Mar. 28, 2018); *Delmonaco v. Berryhill*, No. 1:17-cv-00345-AC, 2018 WL

1448558, at *6 (D. Or. Mar. 23, 2018)).  In this circuit, the Eastern District of Arkansas remanded a case based on these arguments.  *Thomas v. Berryhill*, No. 5:17-CV-00100-JTK, 2018 U.S. Dist. LEXIS 118084, at **4-5 (E.D. Ark. July 16, 2018).

A feature of Claimant's counsel's strategy is that counsel asks the VE to disclose the sources of her job numbers and then fails to ask how the VE is "able to correlate those figures with *DOT* codes. . . . [i]nstead, . . . opt[ing] to reserve the issue for a post-hearing brief. . . . thus assuring an issue for appeal." *Patterson*, 2019 WL 4237854, at *6 (quoting *Smith v. Berryhill*, No. CV 17-0401, 2018 WL 3719884, at *7 (W.D. La July 19, 2018, *R. & R. adopted*, 2018 WL 3715754 (W.D. La. Aug. 3, 2018)); (AR at 328-29, 334 ("[T]here is no correlation between the job incidence data produced by the reliable sources [designated by the SSA in 20 C.F.R. § 404.1566] and the *DOT* Codes.")).

The case at bar followed the same pattern and Claimant makes most of the same arguments. However, Claimant's hearing representatives did make one objection to the VE's testimony during the hearing.  The objection was proffered prior to the representative asking the VE about the sources of her job numbers.  (AR at 60, 62.)  The representative objected to the VE's testimony related to the *DOT* code for each job the VE provided in response to the ALJ's hypothetical.  (*Id.* at 60.)  The representative objected to the VE's job incidents "as related to each *DOT* code" because the census and Bureau of Labor Statistics provides data based on SOC (standard occupational classifications[18]) category rather than *DOT* category.  (*Id.* at 62.)  The following exchange took place between Claimant's representative and the VE later in the hearing.

> [Atty.]:     And in reaching your conclusions for the number of jobs did you assume that each *DOT* code that you identified is also reported under an [SOC] code? Is that correct?

---

[18] O*Net Online, O*Net Online Help, https://www.onetonline.org/help/online/features.

| [VE]: | I used the cross walks that are given, cross walks for [comparing] SOC [job category] codes and *DOT* [job] codes and— |
|---|---|
| [Atty.]: | Okay. |
| [VE]: | —so, they're— |
| [Atty.]: | That's fine. |
| [VE]: | There are ways to look at that information. |

(*Id.* at 62-63.) The representative then asked the VE if she knew how the various sources she relied upon for her job numbers obtained and/or verified their numbers and the VE answered that she did not know. (*Id.* at 63-65.)

*Patterson* pointed out two more disturbing issues with this strategy. First, Claimant's post-hearing brief "purports, misleadingly, to provide 'rebuttal' evidence regarding the obsolescence of the *DOT* that was unavailable during the administrative hearing, which, again, applies to the instant case." 2019 WL 4237854, at *6. However, this evidence "includes a letter . . . from the United States Department of Labor ("DOL letter") dated February 12, 2014 and a letter . . . from the Office of Occupational Statistics and Employment Projections ("OSE letter") dated November 19, 2007, which means that such evidence was available to counsel well before the hearing." *Id.* "There can be little characterization of this approach other than that the representative intentionally withholds evidence that he knows will be relevant during the hearing, specifically in connection with the VE testimony, then ambushes the ALJ with such evidence in a post-hearing brief that feigns 'surprise' at the VE's testimony." *Id.* "[T]he materials . . . make clear that Plaintiff's representatives . . . possessed their 'rebuttal evidence' . . . long before the VE's testimony in this case. . . . Thus Plaintiff's counsel 'reasonably anticipated' that this issue would arise . . . and should have prepared to respond to testimony on that issue at the ALJ's hearing." *Id.* (citing *Jeffries v. Berryhill*, No. 1:18-cv-51, 2019 WL 1005501, at *5 (M.D.N.C. Mar. 1, 2019)) (first set of ellipses in original).

Second, the evidence referred to in *Jefferies* is "the Santagati opinion," a generic opinion letter written by vocational rehabilitation counselor Paula Santagati, former employee of the law firm that represented Plaintiff at the administrative level in the case at bar. *Id.* at *7; (AR at 328). The letter "has apparently been used as part of a duplicitous strategy." *Patterson*, 2019 WL 4237854 at *7.

> The Santagati Opinion appears to be a "form" opinion used by disability claimants whenever a restriction to occasional coworker or supervisor interaction comes into play. . . . Claimants in several cases have offered the same or similarly generic opinions from Ms. Santagati. . . . Like Claimant's use of the Santagati Opinion here, these claimants waited until after the administrative hearing to submit Ms. Santagati's opinion and then, on appeal to the federal district court, argued that the ALJ's treatment of the opinion required remand . . . . While the Court does not know whether all the claimants in the cases identified by the Court were represented by the same representatives at the administrative level, they were all represented at the district court level by Claimant's lead counsel here. This pattern suggests a strategy by disability claimant representatives to forego cross-examining a VE about the issues raised by the Santagati Opinion, even though the opinion is in hand (or at least known) *before* the hearing. . . . The representatives then submit the Santagati Opinion after the hearing, and if the ALJ rules unfavorably despite the submission, the Santagati Opinion serves as a potential basis for remand on appeal. If such a strategy is in fact being implemented, it abuses the process by which claimants can properly submit post-hearing evidence for consideration in social security disability cases.

*Id.* (quoting *Mitchell v. Berryhill*, No. 17C 6241, 2019 WL 426149, at **9-10 (N.D. Ill. Feb. 4, 2019) (emphasis in original). The Santagati opinion has been used in at least ten prior cases. *Patterson*, 2019 WL 4237854, at *7. All three documents mentioned in *Patterson* were filed as rebuttal evidence with Claimant's post-hearing objections. (AR at 337-46, 348-49, 382-83.) Claimant filed a total of eight exhibits with her post-hearing brief. All exhibits were available to Claimant for more than a year before the hearing: the 2007 OSE letter; the 2014 DOL letter; three documents related to SkillTRAN: 2

documents that appear to be photocopies of home pages containing hyperlinks and "Job Numbers" information with a copyright date of 1998-2015 and the date 9/10/15 at the top of the pages, and a document called SkillTRAN Process for Estimating DOT Employment Numbers, copyrighted 20008 and dated 12/26/2008; a 2002 letter and response concerning U.S. Publishing's methodologies; a 2014 Seventh Circuit opinion; and the October 1, 2015 Santagati opinion, along with Ms. Santagati's resume. (*Id.* 337-49, 365-84.)

The Court concurs with *Patterson* that the "tactics" outlined above are improper. *Patterson*, 2019 WL 4237854 at *7. It is concerning to seemingly prolong a case on purpose when a claimant has waited years for a resolution, a point Claimant's counsel acknowledged in the post-hearing brief. (AR at 326.) That being said, after a thorough review of the record, for the following reasons, the Court finds the ALJ did not err in overruling Claimant's objections to the VE's testimony.

### 2. *The ALJ addressed Claimant's objections.*

Claimant argues that the ALJ did not address all objections contained in the post-hearing brief. However, in her decision, the ALJ acknowledged not only the post-hearing brief, but also the objection Claimant made at the hearing. (*Id.* at 28.) In addition, the ALJ stated she was satisfied with the sources upon which the VE relied and with the VE's qualifications to testify regarding Claimant's abilities to work with the public and coworkers, be off task, and be absent. (*Id.* at 28-29.) This statement directly addressed Claimant's objections. The ALJ overruled Claimant's objections because the ALJ's testimony was consistent with the *DOT* and because the Claimant's representative was able to cross-examine Claimant. (*Id.*) The ALJ was not required to discuss every piece of evidence Claimant submitted in her post-hearing brief. *See Wildman*, 596 F.3d at 966 (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)) (an ALJ is not required to discuss every piece of evidence in the record). Importantly, "[a]n ALJ's failure to cite

specific evidence does not indicate that such evidence was not considered." *Id.* This is especially true in a case like the one at bar where the ALJ did cite Claimant's objections and post-hearing brief.

Claimant also argues that "the ALJ has no discretion whatsoever as to whether she rules on objections in some form or other." (Doc. 22 at 15 (emphasis omitted).) For support, Claimant relies on her "constitutional and statutory rights to challenge contrary evidence" of the VE (*Id.* at 14) and the Hearings, Appeals, and Litigation Law Manual ("HALLEX") Sections I-2-6-74(B).[19] Claimant argues that because the ALJ failed to adequately address every one of her objections, remand for a new hearing is required. (*Id.*)

This argument is without merit for two reasons. First, "[i]n the absence of a ruling from the Eighth Circuit Court of Appeals, coupled with the weight of authority that [holds] HALLEX does not create judicially-enforceable rights, the Court declines to find that an ALJ's failure to follow HALLEX is reversible error." *Heitz v. Astrue*, No. 09-CV-2019-LRR, 2010 WL 1521306, at *17 (N.D. Iowa Apr.15, 2010); *Kling v. Colvin*, No. C15-3145-LTS, 2016 WL 4435686, at *4 n.1 (N.D. Iowa August 19, 2016). Second, "HALLEX I-2-6-74(B) provides that an ALJ 'may address the objection(s) on the record during the hearing, in narrative form as a separate exhibit, or in the body of his or her decision.' However, this provision refers to objections made during the hearing, and is silent on how objections made after the hearing may be addressed." *Gentry*, 2018 WL 6045257, at *7. In addition, "the current version of HALLEX I-2-5-

---

[19] "HALLEX conveys guiding principles, procedural guidance, and information to hearing level and Appeals Council staff. HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels. It also includes policy statements resulting from Appeals Council *en banc* meetings under the authority of the Appeals Council Chair." SSA, https://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html

55, dated June 16, 2016 . . . contains no requirement that the ALJ review all objections, regardless of when they were filed." *Id.* (holding that HALLEX did not require ALJ to rule on post-hearing objections because hearing occurred after June 16, 2016). The hearing in the case at bar was held eight months after the current version of HALLEX § I-2-5-55 went into effect. Therefore, the ALJ was not required to address all post-hearing objections.

### 3. *The ALJ did not err by finding VE Salva qualified to testify.*

The Court finds Claimant's argument that the VE was not qualified to testify to be without merit. At the hearing, the ALJ asked Claimant's representative if she objected to having Ms. Salva serve as a VE. (AR at 54.) Claimant's representative replied, "No, but I may have objections to any job incidents, data, per *DOT* code that she may testify to." (*Id.*) Thus, Claimant waived arguments regarding the VE's qualifications "to give opinions on the number of jobs that exist in the local, regional or national economy." (*Id.* at 328.) The ALJ found the VE qualified to testify based on her education, experience, and Social Security regulations that allow ALJs to rely on the testimony of vocational experts. (*Id.* at 28.) The Court finds the ALJ's decision supported by substantial evidence in the record as a whole. *See* 20 C.F.R. § 404.1566(e) (authorizing use of vocational experts); (AR at 319-20) (VE Salva's resume). Thus, the ALJ did not err by overruling this objection.

### 4. *The ALJ did not err by overruling Claimant's objection based on "surprise testimony" and the argument there was no time to cross-examine the VE is without merit.*

Claimant argues that the VE's testimony was a "surprise" and that she had "no advance notice of the hypotheticals that would be presented to the VE prior to the hearing," which meant there was "literally no way of knowing what the [VE] was going to say until she testified." (Doc. 22 at 23 n.15; Doc. 26 at 3.) Claimant asserts that the

*DOT* contains 12,000 jobs, which would make it impossible to prepare to cross-examine a VE prior to a hearing. (Doc. 22 at 23-24 n.15.) Claimant's counsel further asserts that after being involved in many administrative hearings, he knows it was impossible to raise the issues currently before the Court at the hearing because of the "surprise" nature of the VE's testimony and the limited amount of time allowed for each hearing. (Doc. 22 at 23 n.15.)

Although Claimant's hearing representative could not pre-screen the VE's testimony, given the representative's alleged experience, the representative was aware of the types of hypotheticals proffered at Social Security hearings and the bases for those hypotheticals. In this case, the ALJ's hypothetical was based on limitations found in Dr. Lark's February 2015 opinion and the opinion of state reviewing physician Jan Hunter who reviewed the file on reconsideration[20] and found no severe physical limitations. (AR at 88, 97.) Dr. Ryan's post-May 12, 2015 opinion is largely in concert with Dr. Lark's opinion, although Dr. Lark's opinion is more thorough, actually stating the type of work situation that would best fit Claimant. (AR at 88.) Thus, the hypothetical should not have been a surprise because it was based on evidence that had been part of the record since at least May 12, 2015. Moreover, Claimant's representative's wealth of experience should have put the representative on notice regarding the types of questions proffered at Social Security disability hearings. *See Patterson*, 2019 WL 4237854, at *7 (opining that it is reasonable to assume an attorney who has worked on 30,000 cases understands that ALJs routinely base their hypotheticals on the limitations "proffered by medical sources"), *9 (noting that all "rebuttal" evidence predated the hearing and that the exhibits had been used to make the same arguments in other cases).

---

[20] The file had not been reviewed initially for physical impairments. (AR at 96.)

Moreover, the Court agrees with *Smith v. Berryhill*, which noted that, as here, Claimant's "principal thrust" was that the Department of Labor's Bureau of Labor Statistics ("BLS") "does not publish job numbers by *DOT* code, but by . . . [SOC code] and the two regimes are not equivalent." No. CV 17-0401, 2018 WL 3719884, at *6 (W.D. La. July 19, 2018), *R. & R. adopted*, 2018 WL 3715754 (W.D. La. Aug. 3, 2018). However, "since at least 2014, Claimant's representative's firm, Citizens Disability, L.L.C., has known that the BLS is unaware of any data source or methodology for reliably translating the number of jobs from SOC codes to *DOT* codes" because that is what the DOL letter says. *Id.*; (AR at 337-46.) Accordingly, Claimant's representative did not have to "familiarize herself with each of the 12,000 jobs of the *DOT* to question the VE about [her] methodology." *Smith*, 2018 WL 3719884, at *6. "Simply put, [Claimant] was required to raise her objections at the hearing, notwithstanding any alleged impracticalities in doing so." *Jeffries*, 2019 WL 1005501, at *6 (quoting *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at *8 (N.D. Ill. Feb. 4, 2019)).

Although not raised as a post-hearing objection, the Court also finds the argument that Claimant's hearing representative had no time to properly cross-examine the VE to be without merit. After tens of thousands of hearings, it is reasonable to assume Claimant's hearing representative or at least members of her firm know how to use hearing time to a client's best advantage. In this case, the representative chose to use the majority of her time questioning the VE about the methodologies used by the sources the VE relied on for her job numbers when it appears that the representative already had that information. (AR at 62-65; 336-70.) If the rebuttal evidence had been made part of the record before the hearing, perhaps there could have been some way to truncate this testimony or to craft a stipulation, which could have preserved time for the representative to proffer a hypothetical or to ask the VE other relevant questions. *See Patterson*, 2019

WL 4237854, at *6 (discussing litigation strategy that includes withholding evidence so claimant's counsel can "feign surprise" in post-hearing brief).

Claimant's legal team made tactical choices in this case and in many prior cases regarding use of hearing time. As will be discussed below, Claimant did not use that time to object to specific characteristics of jobs proffered by the ALJ, to seek clarification as to how those jobs are performed, or to ask the VE about her methodologies for choosing jobs or determining job numbers, choosing instead to ask questions the answers to which did not become the basis for post-hearing objections. (AR 328-35 (no objections based on VE's lack of knowledge regarding the methodology her sources used to arrive at their own jobs numbers; objections based on insufficiency of sources, themselves).) To the extent Claimant asserts that her argument that the VE was not qualified is based on this testimony, that argument is without merit because the argument was waived. The Court is not convinced that surprise or lack of hearing time require remand of this case. Accordingly, the ALJ did not err in overruling these objections.

### 5. *The ALJ did not err by overruling objections based on the Santagati opinion.*

Claimant argues that the jobs offered by the VE in response to the hypothetical were inappropriate because the positions require more than occasional or superficial interaction with coworkers or supervisors. In support of this argument, Claimant proffers the October 2015 Santagati opinion. (*Id.* at 382-83.) This opinion states that a limitation that includes "occasional interaction with coworkers and supervisors precludes *all* work as the training and probationary period for any job would require more than occasional interaction with co-workers and supervisors." (*Id.* at 383 (emphasis added).)

The generic Santagati opinion is irrelevant to the case it bar because has nothing to do with Claimant or the facts of her case and was written 16 months before the hearing in this matter. Moreover, the opinion is of no probative value because it provides no

support for the opinions expressed in it. Most importantly, the Santagati opinion, which states that anyone limited to occasional contact with the coworkers and supervisors can *never* work, is at odds with Eighth Circuit precedent holding that people who are limited to occasional interaction with coworkers and supervisors can work. *See Hill v. Colvin*, 753 F.3d 798, 800-01 (8th Cir. 2014) (record supported district court's conclusion that claimant retained RFC to occasionally interact with coworkers and supervisors and thus could return to his job as a truck driver); *Richardson v. Berryhill*, No. 16-CV-141-LRR, 2017 WL 1532268, at *3 (N.D. Iowa Apr. 27, 2017) (claimant limited to occasional interaction with supervisors and coworkers), *R.& R. adopted*, 2017 WL 2219983 (N.D. Iowa May 19, 2017). Thus, the ALJ was correct to reject this generic and unsupported opinion in favor of the VE's opinion, which was based on the characteristics of the Claimant and her RFC. *See Jeffries*, 2019 WL 1005501, at *8 (affirming ALJ decision to reject Santagati opinion in favor of VE opinion) (citing *Kidd v. Berryhill*, No. 5:17-CV-420-REW, 2018 WL 3040894, at *11 (E.D. Ky. June 19, 2018) (finding no error where ALJ credited VE's "impartial, expert opinion . . . over Santagati's generalized, non-specific report, expressing the extreme, outlier view (with no record or evidentiary support) that an 'occasional interaction' limitation alone 'precludes all work'"); *Lara v. Berryhill*, No. B-17–77, 2017 WL 7790109, at **9-10 (S.D. Tex. Dec. 4, 2017) ("Santagati identifies no factual basis beyond her own opinion as to why every single job in America requires more than occasional interaction with others)). Accordingly, the ALJ did not err by overruling this objection in favor of the VE's testimony based on an RFC tailored to Claimant's impairments.

6.  **The ALJ did not err by overruling objections that jobs are no longer performed at the unskilled level.**

Claimant argues that that it is a "well-known fact that the *DOT* is an obsolete and static database that is no longer being developed or enhanced by the USDOL [United

States Department of Labor], and the type of information once provided via the *DOT* is now being provided by the USDOL via 'O\*NET.'" (Doc. 22 at 17 (citing AR at 329) (post-hearing brief).) Claimant avers that her objections "demonstrated that vocational information found in the indisputably up to date O\*NET does not support the [VE's] testimony" that two of the jobs identified by the VE, laborer-stores and production helper, are currently unskilled jobs in the national economy. (*Id.* at 17-18.) The Court assumes Claimant's reference to "laborer" is a typographical error because the VE identified order filler, production helper, and skinner as the three jobs a person with Claimant's RFC could perform. (AR at 58.) The ALJ incorporated these three jobs into her decision. (*Id.* at 28.) In spite of using the wrong job title, Claimant uses the *DOT* code for order filler. (Doc. 22 at 18.) Because Claimant's arguments are based on *DOT* codes rather than job titles, Claimant's arguments are based on a proper foundation in spite of the error.

Claimant concedes that the *DOT* is one of the resources of which an ALJ must take administrative notice.[21] (*Id.* at 19.) However, Claimant argues that because 20 C.F.R. Section 404.1566(d) allows ALJs to take administrative notice of "reliable job information available from various governmental and other publications, . . . . common sense dictates" consultation of O\*Net because it is an up-to-date governmental source.

---

[21] Administrative notice of job data. . . . [W]e will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of—

    (1) Dictionary of Occupational Titles, published by the Department of Labor;

    (2) County Business Patterns, published by the Bureau of the Census;

    (3) Census Reports, also published by the Bureau of the Census;

    (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and

    (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics.

20 C.F.R. § 404.1566.

(Doc. 22 at 19 n.12 (citing *Sams v. Berryhill*, No. 1:17cv15-CAS, 2017 U.S. Dist. LEXIS 145424, at \*\*17-18 (N.D. Fla. Sept. 8, 2017).)

Claimant's argument is without merit. First, "while the [*DOT*] appears on the list of governmental and other publications from which the [SSA] can take 'administrative notice of reliable job information,' the O\*NET does not. Thus, even if the VE's testimony was in conflict with O\*NET, there is no requirement that the VE's testimony comply with that database." *Jefferies*, 2019 WL 1005501, at \*8 (quoting *Malfer v. Colvin*, Civ. No. 12–169J, 2013 WL 5375775, at \*5 (W.D. Pa. Sept. 24, 2013) (noting internal citations omitted)) (brackets in original). *Jefferies* addressed the same issue presented in the case at bar and concluded that the VE "labored under no obligation to harmonize her testimony with the O\*NET." *Id.* (citing *Horner v. Berryhill*, No. 17 C 4823, 2018 WL 1394038, at \*2 (N.D. Ill. Mar. 20, 2018) ("[The p]laintiff argues that 'common sense' should prevail over the explicit regulatory language and the [SSA's] continued reliance on the [*DOT*]. [The p]laintiff cites to no legal authority for the wholesale abandonment of the [*DOT*], and we are not willing to rely on 'common sense' as legal support for [the] plaintiff's position.")) (brackets in original). Second, once an ALJ has established that the VE's testimony is consistent with the *DOT*, the ALJ has fulfilled her duty. *Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir. 2007); *Crum v. Colvin*, No. C14-4055-MWB, 2015 WL 4380853, at \*12 (N.D. Iowa July 17, 2015), *R. & R. adopted*, 2015 WL 5084325 (N.D. Iowa Aug. 27, 2015). As one court in this district recently noted, there is no "requirement that an ALJ resolve conflicts between the O\*NET and the VE's testimony." *Dyslin v. Comm'r of Soc. Sec.*, No. 18-CV-0014-LTS, 2019 WL 2219004, at \*5 (N.D. Iowa Feb. 22, 2019), *R. & R. adopted*, 2019 WL 1331742 (N.D. Iowa Mar. 25, 2019) (citing *Valentin v. Berryhill*, No. 3:17cv944(DFM), 2018 WL 4300119, at \*10 (D. Conn. Sept. 9, 2018); *Cooley v.*

*Colvin*, No. CIV. 13-5307, 2015 WL 1119973, at **5-6 (W.D. Ark. Mar. 12, 2015)). In the case at bar, the ALJ fulfilled that duty. (AR at 65-66.) Therefore, the ALJ did not err by overruling this objection.

### 7. *The ALJ did not err by overruling the objection that the skinner job would occasionally involve "other environmental conditions."*

Claimant argues that the job of skinner would require exposure to "dangerous/hazardous 'other environmental conditions.'" (Doc. 22 at 19.) The *DOT* describes this job as requiring exposure to dangerous conditions.[22] (*Id.* at 20.) Claimant asserts that this position is inconsistent with her RFC. According to Claimant, "[i]t is hard to believe that anybody applying for disability should be expected to perform such dangerous and involved work. Especially an individual who has extreme limitations on their ability to interact with the public or coworkers and can only perform simple work." (AR at 334.) Claimant further argues that although this job is categorized as "simple work," a person doing this job would need characteristics and qualities beyond those in Claimant's RFC because the extreme duties with which someone doing this job could be tasked could result in "bodily injury or death" if performed by someone at Claimant's skill level. (*Id.*)

To the extent Claimant argues that this job is not performed at the level designated in the *DOT*, the Court finds that argument to be without merit for the reasons articulated above.

---

[22] "[T]he *DOT Selected Characteristics* states that 'other environmental conditions' 'may include, but are not limited to, such settings as demolishing parts of buildings to reach and combat fires and rescue persons endangered by fire and smoke; mining ore or coal underground; patrolling assigned beat to prevent crime or disturbance of peace and being subjected to bodily injury or death from law violators; diving in ocean and being subjected to bends and other conditions associated with high water pressure and oxygen deprivation; patrolling ski slopes prior to allowing public use and being exposed to danger of avalanches.'" (Doc. 22 at 20 n.13 (citing AR at 334) (citing *DOT Selected Characteristics* at d-2).)

Claimant has not challenged the ALJ's RFC finding and has therefore waived that argument. In addition, Claimant has waived her argument related to the skinner job because Claimant did not object to this job at the hearing. To the extent Claimant's representative wanted to challenge the VE's inclusion of this position or probe the VE as to why this position was appropriate for someone limited to occasional interaction with coworkers or with any of the other limitations Claimant was asserting at the time, the representative had the opportunity to do so at the hearing.

The skinner job is consistent with the *DOT* and Claimant's RFC, which contained no environmental limitations. (AR at 65-66.) That is all that is required under our rules. *See Renfrow*, 496 F.3d at 921. Moreover, when Claimant's representative asked the VE about environmental limitations such as dust and chemicals, the VE testified that this job would not be precluded. (AR at 59.) Moreover, even if this job is inappropriate for Claimant, the VE identified two appropriate jobs, which makes inclusion of this job harmless error. *Otter v. Colvin*, No. CIV. 14-5038, 2015 WL 2380086, at *5 (W.D. Ark. May 19, 2015) (citing *Brueggermann v. Barnhart*, 348 F.3d 689, 695-96 (8th Cir. 2003)). Accordingly, the ALJ did not err by overruling this objection.

### 8. The VE's testimony regarding job availability was not "unfounded, unsupported, unreliable, and conjured from whole cloth."

As discussed above, the VE testified regarding the sources of her job numbers. In addition, the VE stated that her testimony was consistent with the *DOT* and its companion publication, which is called *Selected Characteristics of Occupations*. *See Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014). In her post-hearing objections, Claimant cited rebuttal evidence claiming to undermine the reliability of the *DOT* and the various privately-published sources the VE used to estimate the number of jobs available to Claimant. The Eighth Circuit allows VEs to rely on information provided by private

sources. *Jordan v. Astrue*, 390 F. App'x 611, 611-12 (8th Cir. 2010) ("We . . . reject [claimant's] various challenges to the privately published source of the VE's opinion on the numbers of available jobs.") (citing *Whitehouse v. Sullivan*, 949 F.2d 1005, 1007 (8th Cir. 1991)); *Pryor v. Colvin*, No. 14-00862-MDH, 2016 WL 830068, at *2 (W.D. Mo. Mar. 3, 2016) (rejecting claimant's objections to VE's use of Job Browser Pro by SkillTRAN). "There is no requirement that [the VE] correlate the *DOT* titles with Job-Services summaries. The [VE] is only required to state [her] opinion as to the number of jobs available in the national economy to a person with the applicant's [RFC], age, work experience, and education." *Whitehouse*, 949 F.2d at 1007. The VE did this in the case at bar. Her testimony was consistent with the *DOT*. The ALJ acknowledged the sources upon which the VE relied and was satisfied that the VE's testimony was "well founded." (AR at 28-29.) The ALJ also found the VE to be a reliable source of testimony based on her training, professional knowledge, and experience in job placement. (*Id.*)

In addition, all of Claimant's rebuttal evidence existed prior to the hearing. Hearing representatives as experienced as the ones in this case could easily have filed this evidence prior to the hearing so as to have it available at the hearing, assuming Claimant's representative wanted to ask the VE about this evidence. Sandbagging to have a second bite at the apple on remand, which is what seems to have occurred here, unnecessarily prolongs cases. More importantly, none of Claimant's evidence has convinced the Court that remand is necessary. The Claimant does not take issue with the VE's qualifications, nor could she. Moreover, the courts in this circuit have approved the use of the two sources Claimant takes issue with in her post-hearing objections. *See Jordan v. Astrue*, No. 4:08CV3217, 2009 WL 3380979, at *7 (D. Neb. Oct. 21, 2009) (use of Occupational Employment Quarterly ("OEQ") by U.S. Publishing), *aff'd*, 390 F. App'x 611 (8th Cir. 2010); *Pryor*, 2016 WL 830068, at *2 (use of Job Browser Pro by SkillTRAN). Accordingly, the ALJ did not err in overruling this objection.

*9.* *Conclusion*

The Court finds that the ALJ did not err when she overruled Claimant's objections to the post-hearing brief. The ALJ properly relied on the VE's testimony. Therefore, the ALJ's decision on this issue is affirmed.

## IV.    CONCLUSION

For the foregoing reasons, the decision of the ALJ is **affirmed.** Claimant's Complaint **(Doc. No. 4)** is **dismissed with prejudice.**

**IT IS SO ORDERED** this 26th day of September, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa